# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

```
FILED: MARCH 4, 2009
09CV1363
JUDGE DOW
MAGISTRATE JUDGE DENLOW
AO
```

| | |
|---|---|
| MARTHA SCHILKE, both individually and as a representative of all other persons similarly situated )<br><br>Plaintiff )<br><br>vs. )<br><br>WELLS FARGO & CO. )<br>WACHOVIA CORP. )<br>AMERICAN SECURITY INSURANCE, INC. )<br>Defendants ) | **Civil Action No.**<br><br><br><br>Plaintiff demands a jury trial. |

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff MARTHA SCHILKE, both individually and as a representative of all other persons similarly situated, by and through her attorneys, John Xydakis of the Law Office of John S. Xydakis, P.C. and Thomas F. Courtney, Jr. of Thomas F. Courtney & Associates, P.C., and for her Complaint against Wells Fargo & Co. (hereafter "Wells Fargo"), Wachovia Corp. (hereafter "Wachovia") and American Security Insurance, Inc. (hereafter "ASI"), makes the following allegations on information and belief, except those allegations that pertain to Plaintiff which are based on personal knowledge or investigation by Plaintiff's counsel, as follows:

## A. PRELIMINARY STATEMENT

1. Plaintiff brings this action against Defendants on behalf of herself and on behalf of a class of similarly situated persons throughout the United States seeking to recover sums improperly paid for the placement, maintenance, or servicing of insurance policies procured by Wachovia from ASI.

2. Plaintiff alleges that Defendants arranged and directed the practices complained of herein whereby, *inter alia*, in exchange for Wachovia's placement, maintenance, or servicing of ASI's insurance policies, Wachovia would be paid a kickback by ASI which was not disclosed to Plaintiff or the Class.

3. That is, Defendants would bill and charge Plaintiff and the Class for an amount it represented to them as an "insurance premium," purportedly the amount due for insurance coverage from ASI, but which actually included substantial undisclosed "commissions" (the word 'commission' as used herein shall include all forms of refunds, rebates, dividends, credit balances, commissions, experience related rebates, profit related rebates, profits, contingent profits, contingent commissions or other compensation or other benefits or property retained or received by financing or other entities. The word 'commission' will also be referred to herein as a 'kickback'.).

4. In Plaintiff's case, the insurance premiums assessed increased to $2,034 a month, more than double the Plaintiff's previous $841 payment for insurance, for less coverage. This is believed to be due, in large part, to the large kickbacks that were being paid by for the placement, maintenance, or servicing of the insurance.

5. The National Association of Insurance Commissioners has recognized that this is a form of reverse competition that harms borrowers. This is because, "the creditor [lender] typically chooses which insurer will provide coverage rather than the consumer. Consequently, insurers may compete for business by offering higher compensation to creditors." Thus, the higher the percentage of premiums the insurance company offers the lenders as kickbacks, the more economically attractive that insurer's products are to lenders, as these kickbacks are computed as a percentage of the overall premium. The

1    insurance company that markets the highest priced insurance, and allows the lenders to

2    keep the highest percentages of the premiums, generally secures the greatest market share.

3        6.   The U.S. Supreme Court in *Northern Pacific Ry. v. U.S.*, 356 U.S. 1, 6

4    (1958)(tying arrangements) has also condemned arrangements that can foreclose

5    competitors' access to purchasers and hence may infringe upon competitive behavior and

6    impair the maintenance and continuance of economically efficient market structures and

7    performance, such as this one.

8        7.   In fact, for tangible items, Section 1(c) of the Robinson-Patman Amendment to

9    the Clayton Act prohibits such because of the effects:

10           "It shall be unlawful for any person engaged in commerce, in the course of
11           such commerce, to pay or grant, or to receive or accept, anything of value as
12           a commission, brokerage, or other compensation, or any allowance or
13           discount in lieu thereof, except for services rendered in connection with the
14           sale or purchase of goods, wares, or merchandise, either to the other party to
15           such transaction or to an agent, representative, or other intermediary therein
16           where such intermediary is acting in fact for or in behalf, or subject to the
17           direct or indirect control, of any party to such transaction other than the
18           person by whom such compensation is so granted or paid."
19

20                          **B. PARTIES, JURISDICTION & VENUE**

21        8.   Plaintiff Martha Schilke is over eighteen years of age and is a resident of Illinois.

22        9.   Wachovia is a nationwide financial institution that, in part, is in the business of

23    providing and managing residential mortgages.  It is a North Carolina corporation with its

24    principal place of business located at 327 Hillsborough Street, Raleigh, North Carolina.

25        10.  On or about November 2008, Wells Fargo acquired all outstanding shares of

26    common stock of Wachovia in a stock-for-stock transaction; Wells Fargo is a Delaware

27    corporation with its headquarters in California.

11. According to an October 9, 2008 press release issued by Wells Fargo, "Wells Fargo will acquire all of Wachovia Corporation and all its businesses and obligations, including its preferred equity and indebtedness, and all its banking deposits."

12. The October 9, 2008 press release issued by Wells Fargo also states that "[i]n the transaction, Wells Fargo will acquire all of Wachovia Corporation and all its businesses and obligations, including its preferred equity and indebtedness, and all its banking deposits."

13. In addition, in that press release, Wells Fargo states "that it will keep Wachovia intact."

14. This is evidenced by the television advertisements now being run indicating that Wells Fargo is still using the Wachovia name and operations.

15. Thus Wells Fargo is liable for both the liability and damages against Wachovia sought herein.

16. ASI is an insurance company that in part provides home owners insurance. It is a Delaware corporation with its principal place of business located at 2711 Centerville Road, Wilmington, Delaware.

17. The Court has diversity jurisdiction. Plaintiff is a resident of Illinois. Wachovia and ASI are residents of North Carolina and Delaware respectively. Wells Fargo is a resident of California and Delaware. In addition, Plaintiff seeks damages in excess of $75,000.

18. In addition, this Court has jurisdiction over this matter pursuant to the Class Action Fairness Act as the matter in controversy exceeds $5 million, exclusive of interest and costs, it is filed as a class action, and, on information and belief, there is a member of the class of plaintiffs who is a citizen of a State different from any of Defendants.

## C. CLASS OF PERSONS

19.  Plaintiff brings this action on behalf of herself and as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class:  All persons (excluding Defendants, its managers and directors, its present and former parents, subsidiaries and affiliates of Defendants and any co-conspirators and any government entity) who had insurance procured, serviced, or maintained for them by Wachovia with ASI for which Wachovia received, or is receiving, a kickback.

20.  Plaintiff believes that there are hundreds of Class members as above described, the exact number and their identities being known by Defendants.

21.  The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

22.  There are questions of law and fact common to the Class, which questions relate to the existence of the alleged kickbacks and there is a common pattern of injury sustained as a result of Defendants' actions.

23.  Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect these interests of the Class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

24.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

25. Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

26. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

27. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation.

28. The substantive law of all 50 States regarding these claims is sufficiently closely aligned with Illinois law such that the use of Illinois law to determine the rights of the parties will not violate due process. Alternatively, to the extent that any such conflict may appear, Plaintiff requests that the Class simple be divided into sub-classes to deal with such a situation.

### D. FACTS APPLICABLE TO ALL COUNTS

29. On or about, March 22, 2006, Plaintiff purchased a townhome ("property") located at 8828 Berkeley Court, Orland Park by entering into and executing documents for a home loan including a note and 30 year mortgage with World Savings Bank of San Antonio, Texas (attached hereto as Exhibit 1 and fully incorporated herein).

30. On information and belief, the mortgage for Plaintiff is the same, or substantially similar, to the ones executed by all members of the Class and is a form agreement.

31. Subsequent to the home purchase World Savings Bank merged into Wachovia and Wachovia assumed the obligations and liabilities of her mortgage. The loan

documents provide in part that Plaintiff was required to demonstrate current coverage for the property.

32.   The mortgages used are preprinted adhesion contracts presented to the Plaintiff and the Class on a take it or leave it basis and the Plaintiff and the Class has no ability to negotiate its terms. .

33.   The Plaintiff and the Class have no reasonable alternative in the marketplace other than to use these mortgages, which contain substantially the same provisions.

34.   When Wachovia alleges that evidence of the renewal of residential insurance is not provided by a borrower, Wachovia will force place insurance at the expense of the borrower, purchasing new insurance with a different provider.  One of these providers is ASI.   However, Wachovia and ASI intentionally and unconscionably add large costs to the premium, and offer less insurance coverage, all to the detriment of the borrower.

35.   As the Plaintiff was contractually required to maintain insurance on the property pursuant to her mortgage (Exhibit 1, ¶#5), on or about January 1, 2008, Plaintiff contracted to purchase "Hazard" insurance through Grange Mutual Insurance for coverage in the amount of $200,000 for the dwelling and $500,000 for personal liability.

36.   The premium paid for the coverage was in the amount of $841, and had a deductible for $500, which is shown in the Coverage Information column of the Evidence of Property Insurance (Exhibit 2 attached hereto and fully incorporated herein).

37.   On or about May 9, 2008 Wachovia sent a letter to Plaintiff requesting insurance information for the property.

38.   Then, on July 18, 2008 Wachovia sent to Plaintiff a notice of placement of insurance with ASI, with a premium assessed in the amount of $2,034 (Exhibits 3 and 4 respectively attached hereto and fully incorporated herein).

39. As noted in these Exhibits, even though this insurance cost was more than double Plaintiff's previous insurance premium, it actually covered Plaintiff for a smaller loss, excluding the personal property insurance the previous policy contained.

40. Upon force placing the insurance, Wachovia charges for the forced place insurance even in the event of the issuance of a refund upon cancellation of the policy.

41. On or about September 28, 2008, Plaintiff sent a letter to Wachovia to their "Hazard Insurance Processing Center" requesting proof of payment and Wachovia's cost. However, Wachovia refused to provide the information (Exhibits 5 & 6 respectively, attached hereto and fully incorporated herein).

42. ASI and Wachovia represented the amounts owed for insurance coverage to the Plaintiff and the Class as "insurance premiums" but, on information and belief, contained substantial undisclosed kickbacks paid to Wachovia by ASI.

43. Some time before this date, on information and belief, Wachovia entered into an agreement with ASI whereby in exchange for Wachovia's placement, servicing or maintenance of their borrowers' insurance with ASI, Wachovia would receive substantial undisclosed kickbacks from ASI.

44. In essence, ASI became a captive insurance company to Wachovia and charged higher than normal premiums to the Plaintiff and the Class, without disclosing this fact to them.

45. The cost for Plaintiff's insurance was at minimum 140% higher than comparable coverage and Defendants made the decision not to disclose to the Plaintiff and the Class that the "insurance premiums" included substantial kickbacks

46. At all times relevant hereto, Defendants knew that the amount represented to the Plaintiff and the Class as an "insurance premium" was not the actual cost of such insurance, because it contained, *inter alia*, substantial undisclosed kickbacks.

47. Thus, the amount set forth for "insurance premiums" was far in excess of the actual amount paid for such and was inflated, overpriced, and in excess of the fair market value of comparable insurance because it included substantial undisclosed kickbacks.

48. Defendants misrepresented to Plaintiff and the Class that they were contractually obligated to pay all stated amounts for insurance coverage, at all times labeled the charge as an "insurance premium" and at all time represented that this was the actual premium amount they owed for insurance coverage.

49. Defendants charged the Plaintiff on a monthly basis for insurance coverage starting from or about January 1, 2007 through December 1, 2008, misrepresenting the charges for insurance coverage as "insurance premiums."

50. As noted above, in Plaintiff's case, her insurance premium from Defendants increased to $2,034 a month, or thereabouts, which was more than double the amount Plaintiff has previously been paying for insurance, $841, and had less coverage than her previous insurance.

51. This increase was due, in large part, to the large kickbacks that were being paid by the Defendants for the placement, maintenance, or servicing of the insurance.

52. At no time were Plaintiff and the Class ever informed that this "insurance premium" was not the amount charged for insurance, but, in fact, included substantial undisclosed kickbacks

53. Instead, Defendants secretly entered into these kickback agreements. As such, Plaintiff and the Class believed their entire "insurance premium" payment was to be paid

for, and fully remitted, for insurance coverage on their property and that this was the actual cost for such insurance coverage from one or more of Defendants.

54. On information and belief, these kickback agreements were devised, implemented and negotiated by Defendants, their officers, directors, and upper level management.

55. At all times relevant hereto, Plaintiff and the Class had no agreements with Defendants authorizing them to retain, or be paid, kickbacks from Defendants. Instead, the Mortgages merely required Plaintiff and the Class to pay for the actual costs of insurance coverage.

56. Plaintiff and the Class would not have paid the "insurance premiums" had Defendants informed them that they included a substantial kickback.

57. Had Plaintiff and the Class known that the cost for their insurance was less than represented, they either could have attempted to negotiate a better overall price for the insurance or attempted to purchase their insurance elsewhere.

58. As Defendants never disclosed their kickback agreements to Plaintiff and the Class and kept them secret, at all times relevant hereto, Plaintiff and the Class had no knowledge that Defendants were collecting kickbacks from Defendants and could not know that the amounts being billed as "insurance premiums" were not, in fact, the true cost of the actual insurance coverage.

59. Hence, because of this nondisclosure, the money paid by Plaintiff and the Class for the insurance premiums were paid under a mistake of fact as Defendants effectively represented that they had no choice but to make the "insurance premium" payments or be in breach of their Mortgages.

60. Thus, Defendants collected from Plaintiff and the Class amounts in excess of the true cost of the insurance coverage for which Plaintiff and the Class were contractually obligated to pay while charging Plaintiff and the Class as if no kickbacks were paid.

61. Defendants reasonably expected the misrepresentations and to be acted upon by Plaintiff and the Class, who relied on the misrepresentations in good faith and to their detriment and have been prejudiced by making payments to Defendants which consisted of hidden kickbacks.

62. Furthermore, Plaintiff and the Class were forced to pay the insurance premiums under duress.

63. If Plaintiff and the Class failed to pay their "insurance premiums," the Defendants would have, or could have: held Plaintiff and the Class in breach of their mortgages, that is, holding their loans in default; assessed interest charges, penalties, and late charges on Plaintiff and the Class; reported Plaintiff and the Class to credit reporting agencies which would adversely affected their credit rating; threatened Plaintiff and the Class with repossession or foreclosure on the properties secured by their mortgages; actually repossessed or foreclosed upon Plaintiff and the Class' property secured by their Mortgages; and instituted legal proceedings against Plaintiff and the Class for the above-mentioned charges and for any deficiency judgments relating to the repossession or foreclosures which includes substantial attorney's fees, court costs, and other costs of taking and disposing of the secured property.

64. Such adverse consequences would have had disastrous effects on the ability of Plaintiff and the Class to conduct their personal and business affairs.

65. In fact, before Plaintiff's property was foreclosed by Wachovia, or one of its affiliates, when Plaintiff was unable to make payments in full to on the dates required,

Wachovia would send letters to the Plaintiff threatening immediate repossession of her property (Exhibits 7 & 8 attached hereto and fully incorporated herein); on information and belief, these or similar threats of foreclosure or repossession were also made to other members of the Class, as well, should they not remit their payments in full.

66.  Also, when Plaintiff made a late payment to Wachovia for her monthly payment, which included an "insurance premium," she was assessed late charges and/or penalties; which is, on information and belief, Wachovia's policy and practice.

67.  Plaintiff and the Class were never informed by Defendants that less than full payment was acceptable without incurring above-mentioned consequences and hence the Plaintiff and the Class believed that if the total amount was not tendered to Defendants, the above adverse consequences would result.

68.  Plaintiff and the Class' payments were made to prevent injury to their property and were for necessities, such as their homes, and hence not paying the amounts billed would have had disastrous consequences for them.

69.  Plaintiff and the Class did not have an adequate opportunity to further effectively protest the demands as under their mortgages, they were required to make monthly financing and insurance payments.

70.  Wachovia wielded a great deal of power and influence over the Plaintiff and the Class as they were holding their Mortgages and if there was any deficiency in making payments, Wachovia would declare their Mortgages in default and start repossession or foreclosure proceedings.

71.  In fact, when Plaintiff failed to be able to remit in full these amounts, on or about September 29, 2008 Wachovia declared the Plaintiff to be in default and filed for

1   foreclosure on her home. Additionally, Plaintiff was sent a letter for a reinstatement quote

2   which may have included insurance monies advanced.

3       72. As such, Plaintiff's credit rating and financial position have been severely hurt.

4       73. On information and belief, there exists at Defendants ways to trace and/or identify

5   accounts that specifically contain these kickbacks.

6       74. The filing of this Complaint constitutes notice that all "insurance premiums" paid

7   to the Defendants by Plaintiff and the Class which include kickbacks are paid under

8   protest.

9       75. Thus, *inter alia*, Defendants have engaged in one or more of the following

10  wrongful acts:

11      a.    Misrepresenting the nature of the charges imposed upon Plaintiff and the

12      Class as an "insurance premium," when in truth and in fact, this "insurance

13      premium" was the total of the actual insurance premium plus substantial

14      undisclosed kickbacks;

15      b.    Charging and collecting from Plaintiff and the Class amounts in excess of

16      the true cost of the insurance coverage for which Plaintiff and the Class;

17      c.    Billing and charging Plaintiff and the Class for excessive charges,

18      substantial undisclosed kickbacks which were unreasonable, unnecessary, and

19      unfairly increased their insurance costs, that they did not authorize or consent to

20      while representing to Plaintiff and the Class that such charges were owed by

21      including them in the "insurance premiums;"

22      d.    Unfairly extracting from Plaintiff and the Class excessive sums under the

23      disguise of an "insurance premium;"

e.     Placing a bogus charge, an "insurance premium," on Plaintiff and the Class' invoices and representing that Plaintiff and the Class actually owed the charge when they had no basis to make such a representation;

f.     Failing to inform Plaintiff and the Class that they were paying kickbacks and charging them as if no such monies were paid;

g.     Taking advantage of Plaintiff and the Class by creating an obstacle to the free exercise of decision making by failing to disclose that kickbacks were being paid on the insurance policies issued to Plaintiff and the Class;

h.     Taking advantage of Plaintiff and the Class by forcing them to pay "insurance premiums" that were higher than the true costs of the actual insurance premium which would have covered the insurance policies; and/or

i.     Engaging in unfair conduct by taking advantage of an existing obstacle which prevents free consumer choice from effectuating a self correcting market by failing to disclose the kickbacks.

76. Defendants' acts cause substantial consumer injury by forcing Plaintiff and the Class to pay higher insurance premiums because of the substantial undisclosed kickbacks, and the injury is not reasonably avoidable by Plaintiff and the Class as Defendants do not disclose the fact that they are paying such kickbacks and if Plaintiff and the Class did not pay their "insurance premiums," their property would be foreclosed on.

77. Defendants' acts cause a substantial harm to a large number of consumers, including Plaintiff and the Class, which is not outweighed by any advantages.

78. Furthermore, Defendants' costs of such disclosure of said kickback agreements would be minimal, while consumers, including Plaintiff and the Class, would benefit

enormously from such by allowing them to make free and fully informed decisions about what insurance carrier to use.

79. Defendants' acts are unfair, they charge Plaintiff and the Class with excessively high prices, do not inform them of the kickbacks, and they are in a superior position as Defendants are the ones who choose the insurance and premiums to be paid by Plaintiff and the Class and after this forced placement takes place, Plaintiff and the Class cannot negotiate the terms of the "insurance premium."

80. Defendants' acts also offend the public policy of Illinois and other states, which prohibits and discourages such undisclosed kickbacks. For example, Defendants' acts violate 215 ILCS 5/500-80, which prohibits kickbacks to unlicensed insurance agents or brokers.

81. Defendants' practices also violate both public policy and statutory prohibitions in Illinois and other states on giving and/or receiving kickbacks for procuring insurance. For example, in Illinois, 215 ILCS 5/151 prohibits the giving or accepting of rebates in exchange for procuring insurance.

82. Defendants' acts are also oppressive as Defendants are essentially forcing Plaintiff and the Class to pay substantial undisclosed kickbacks which they never agreed to do and as these kickback agreements are not disclosed to Plaintiff and the Class, they have no way to negotiate the terms of any "insurance premiums." Hence, Plaintiff and the Class had no reasonable alternative but to pay the excessive "insurance premiums."

83. The above-mentioned acts by Defendants occurred in a course of conduct involving "trade or commerce" and the acts have injured both consumers, of which Plaintiff and the Class are members, and the public.

84. On information and belief, prior to the acts involving Plaintiff and the Class, Defendants have engaged in other similar acts as the ones mentioned above.

85. Defendants' acts have a real and substantial potential for repetition as they effectively fraudulently conceal the kickback agreements from Plaintiff and the Class.

86. Defendants committed the above-mentioned acts knowingly, intentionally, willfully, with actual malice, and with a wanton disregard of the rights of Plaintiff and the Class.

87. Defendants committed the above-mentioned acts with the intent, and in order to induce, Plaintiff and the Class' reliance thereupon.

## E. COUNTS

### COUNT I – VIOLATION OF CONSUMER FRAUD STATUTE (WACHOVIA)

88. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

89. This Count is brought against Wachovia.

90. Wachovia's acts as alleged above violate the Consumer Fraud and Deceptive Practices Act ("Act"), the scope of which covers all of the relevant transactions noted herein.

91. As a direct and proximate result of the above-mentioned acts by Wachovia, Plaintiff and the Class did suffer actual damages as, *inter alia*, they were required to pay unreasonable and unnecessary charges for insurance as the kickbacks were not disclosed to them and they were coerced into having insurance provided by ASI at a price far above that which they had previously paid.

92. *Inter alia*, as noted above, Wachovia is liable to Plaintiff and the Class as it formulated, actively participated in, intended and directed the conduct complained of herein and with knowledge of the conditions and its consequences.

93. Alternatively, Wachovia is also liable as it performed wrongful acts and knowingly provided substantial assistance to ASI in their unlawful and/or tortuous acts by acting in concert with them pursuant to a common plan to misrepresent and to charge Plaintiff and the Class for "insurance premiums" without disclosing the fact that these "insurance premiums" included substantial kickbacks.

94. Wachovia was aware of its role as part of this tortuous or unlawful plan at the time it rendered assistance to ASI.

95. The deliberate, intentional and deceptive concealment and failure to disclose that such kickbacks were paid constitute an unfair method of competition and deceptive trade practice.

## COUNT II – FRAUD (WACHOVIA)

96. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

97. This Count is brought against Wachovia.

98. Wachovia is liable to Plaintiff and the Class as it had a duty to disclose that the "insurance premiums" charged to Plaintiff and the Class contained substantial kickbacks, but failed to do so.

99. Because of this, Plaintiff and the Class relied on this misrepresentation and remitted their "insurance premium" payments when they would not have done so had they been informed that their payments included substantial kickbacks

100. As a direct and proximate result of Wachovia's acts and Plaintiff and the Class' justifiable and reasonable reliance thereupon, Plaintiff and the Class have been damaged by remitting payments for "insurance premiums" when in truth and in fact the amount that they paid was not simply payment for insurance coverage, but also for substantial undisclosed kickbacks.

101. Alternatively, Wachovia is liable to the Plaintiff and the Class as it knowingly accepted the benefits of unlawful conduct.

102. Alternatively, Wachovia is liable to the Plaintiff and the Class as it ratified the fraudulent conduct of ASI.

103. As a direct and proximate result of Wachovia's fraudulent conduct, Plaintiff and the Class have been damaged.

## **COUNT III – CONVERSION (WACHOVIA)**

104. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

105. This Count is brought against Wachovia.

106. Without legal cause or justification, Wachovia converted Plaintiff and the Class' property by charging and collecting from Plaintiff and the Class for "insurance premiums" which was represented to them as being payment solely for insurance coverage, when in truth and in fact, these "insurance premiums" contained substantial undisclosed kickbacks

107. Wachovia has refused to turnover said property to Plaintiff and the Class despite demands herein that they do so.

108. These funds that belong to Plaintiff and the Class are identifiable by their source or description, the payments made by Plaintiff and the Class to Defendants for their "insurance premiums."

109. As a direct and proximate result of Wachovia's acts, Plaintiff and the Class have been damaged.

### COUNT IV – UNJUST ENRICHMENT (WACHOVIA)

110. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

111. This Count is brought against Wachovia.

112. By the foregoing conduct, Wachovia has been unjustly enriched as it has wrongfully and unjustly retained the benefits of conduct prohibited by law and the retention of these benefits violate fundamental principles of justice, equity and good conscience as it failed to disclose to Plaintiff and the Class the substantial undisclosed "commission," thereby fraudulently compelling them to pay the "insurance premiums" under the threat of having their property repossessed or foreclosed upon should they not make such payments.

113. Equity and good conscience demands that both the funds retained by or paid to Wachovia by ASI as kickbacks should instead be remitted to Plaintiff and the Class.

### COUNT V – VIOLATION OF CONSUMER FRAUD STATUTE (ASI)

114. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

115. This Count is brought against ASI Company.

116. ASI's acts as alleged above violate the Consumer Fraud and Deceptive Practices Act ("Act"), the scope of which covers all of the relevant transactions noted herein.

117. As a direct and proximate result of the above-mentioned acts by ASI, Plaintiff and the Class did suffer actual damages as, *inter alia*, they were required to pay unreasonable and unnecessary charges for insurance as the kickbacks were not disclosed to them and they were coerced into having insurance provided by ASI at a price far above that which they had previously paid.

118. *Inter alia*, as noted above, ASI Company is liable to Plaintiff and the Class as it formulated, actively participated in, intended and directed the conduct complained of herein and with knowledge of the conditions and its consequences.

119. Alternatively, ASI is also liable as it performed wrongful acts and knowingly provided substantial assistance to Wachovia in their unlawful and/or tortuous acts by acting in concert with them pursuant to a common plan to misrepresent and to charge Plaintiff and the Class for "insurance premiums" without disclosing the fact that these "insurance premiums" included substantial kickbacks; ASI was aware of its role as part of this tortuous or unlawful plan at the time it rendered assistance to Wachovia.

## COUNT VI – FRAUD (ASI)

120. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

121. This Count is brought against ASI Company.

122. ASI Company is liable to Plaintiff and the Class as it had a duty to disclose that the "insurance premiums" charged to Plaintiff and the Class contained substantial kickbacks, but failed to do so.

123. Because of this, Plaintiff and the Class relied on this misrepresentation and remitted their "insurance premium" payments when they would not have done so had they been informed that there payments included substantial undisclosed kickbacks.

124. As a direct and proximate result of ASI Company's acts and Plaintiff and the Class' justifiable and reasonable reliance thereupon, Plaintiff and the Class have been damaged by remitting payments for "insurance premiums" when in truth and in fact the amount that they paid was not simply payment for insurance coverage, but also for substantial undisclosed kickbacks.

125. Alternatively, ASI is liable to Plaintiff and the Class as it knowingly accepted the benefits of Wachovia's fraudulent acts.

126. Alternatively, ASI Company is liable to Plaintiff and the Class as it ratified the fraudulent conduct of Wachovia's fraudulent conduct.

127. As a direct and proximate result of ASI Company's fraudulent conduct, Plaintiff and the Class have been damaged.

## COUNT VII – CONVERSION (ASI)

128. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, the Plaintiff states as follows:

129. This Count is brought against ASI.

130. Without legal cause or justification, ASI converted Plaintiff and the Class' property by charging and collecting from Plaintiff and the Class for "insurance premiums" which was represented to them as being payment solely for insurance coverage, when in truth and in fact, these "insurance premiums" contained substantial undisclosed kickbacks.

131. ASI has refused to turnover said property to Plaintiff and the Class despite demands herein to do so.

132. These funds that belong to Plaintiff and the Class are identifiable by their source or description, the payments made by Plaintiff and the Class to Defendants for their "insurance premiums."

133. As a direct and proximate result of ASI's acts, Plaintiff and the Class have been damaged.

## COUNT VIII – UNJUST ENRICHMENT (ASI)

134. Plaintiff reiterates and realleges Paragraphs 1-87 as though fully stated herein. In addition, Plaintiff states as follows:

135. This Count is brought against ASI.

136. By the foregoing conduct, ASI has been unjustly enriched as it has wrongfully and unjustly retained the benefits of conduct prohibited by law and the retention of these benefits violate fundamental principles of justice, equity and good conscience as it failed to disclose to Plaintiff and the Class the substantial undisclosed "commission," thereby fraudulently compelling them to pay the "insurance premiums" under the threat of having their property repossessed or foreclosed upon should they not make such payments.

137. Equity and good conscience demands that both the funds retained by or paid to Wachovia by ASI as kickbacks should instead be remitted to Plaintiff and the Class.

## JURY DEMAND

Plaintiff demands a jury trial on all Counts.

WHEREFORE, for each and/or any of the above Counts, Plaintiff prays that this Honorable Court grant the following relief, make the following findings, and enter the following Orders:

A. Certify this cause of action as a class action pursuant to **Federal Rule of Civil Procedure 23**;

B. Pursuant to **815 ILCS 505/10a(c),** temporarily and permanently enjoin Defendants, their agents, successors, officers, employees, and those acting in concert with them or for them from engaging in each of the unlawful practices, policies, customs, and usage set forth herein, and from continuing any and all other practices shown to be in violation of applicable statute **815 ILCS 505** *et seq*;

C. Enter a declaratory judgment against the Defendants that the practices complained of herein are unlawful and in violation of **815 ILCS 505** *et seq*;

D. Enter a judgment against the Defendants in an amount necessary to compensate and make whole Plaintiff and the Class for all benefit-of–the bargain losses sustained;

E. Enter a judgment against the Defendants in an amount necessary to compensate Plaintiff and the Class for all incidental, and consequential damages caused by Defendants' unlawful actions;

F. Enter an Order compelling Defendants to disgorge all monies obtained as a result of its tortuous acts to Plaintiff and the Class;

G. Enter an Order compelling Defendants to disgorge all monies, late fees, charges, penalties and/or profits obtained as a result of Defendants' unlawful acts;

H. Enter an Order compelling that an accounting be taken to determine all sums due and owing Plaintiff and the Class;

I. Grant restitution to Plaintiff and the Class in an amount found to be suitable and sufficient;

J. Enter an Order awarding Plaintiff and the Class pre-judgment interest on any monies obtained at trial;

K. Enter an Order allowing Plaintiff and the Class to rescind their insurance agreements with Defendants and compelling Defendants to reimburse them in full for all said payments plus applicable interest as well as all incidental and consequential damages sustained, all insurance premiums paid including all late charges, penalties and other costs incurred by Plaintiff and the Class as a result of Defendants' unlawful acts;

L. Enter an Order that the Defendants make restitution to Plaintiff and the Class in the amount of all "insurance premiums" paid to Defendants by Plaintiff and the Class, or alternatively, all kickbacks paid;

M. Enter a judgment against the Defendants in an amount necessary to compensate Plaintiff and the Class for the costs and disbursements of this action, including reasonable attorney's fees pursuant to **815 ILCS 505** *et seq*;

N. Enter a judgment against Defendants in an amount necessary for exemplary or punitive damages to deter Defendant's actions in the future; and

O. Grant such other relief as may be just and proper including all court costs.

Respectfully Submitted,
MARTHA SCHILKE both individually and as a
representative of all other persons similarly situated


BY: _____
John Xydakis, an Attorney for Plaintiff

**ATTORNEYS FOR PLAINTIFF**
John S. Xydakis
Law Office of John S. Xydakis, P.C.
Suite 200
7518 W. Madison St.
Forest Park, IL 60130
(708) 771-8888


Thomas F. Courtney, Jr.
Thomas F. Courtney, Sr.
Thomas F. Courtney & Associates, P.C.
7000 West 127th Street
Palos Heights, IL 60463
(708) 448-4400

RECORDING REQUESTED BY AND
WHEN RECORDED, MAIL TO:
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

PREPARED BY:
DORRIE BRENNAN
WORLD SAVINGS
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER: 0042167965

NOTE AMOUNT: 231,375.00

Doc#: 0608102062 Fee: $56.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 03/22/2006 08:20 AM Pg: 1 of 17

**FOR RECORDER'S USE ONLY**

## MORTGAGE

THIS IS A FIRST MORTGAGE WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS
ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF
PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED
INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR
RENEGOTIATED. THE SECURED NOTE PROVIDES FOR BIWEEKLY PAYMENTS OF
PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS MORTGAGE IS
$289,218.75 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

---

I.   **DEFINITIONS OF WORDS USED IN THIS MORTGAGE**
   **(A)   Security Instrument.** This Mortgage, which is dated **March 8, 2006** will be called the "Security
Instrument."

   **(B)   Borrower. MARTHA SCHILKE, AN UNMARRIED WOMAN**

sometimes will be called "Borrower" and sometimes simply "I" or "me."

   **(C)   Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS
AND/OR ASSIGNEES,** will be called "Lender." Lender is **a FEDERAL SAVINGS
BANK,** which is organized and exists under the laws of the United States. Lender's
address is **1901 Harrison Street, Oakland, CA 94612** .



LENDER'S USE ONLY

0 0 3

SD008A (2005-02-1)                          MORTGAGE-ADJUSTABLE                          IL
DEFERRED INTEREST                                     Page 1

**EXHIBIT**

1

0042167965

(D)    **Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$231,375.00** ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay the debt in full by **April 3, 2036**.

(E)    **Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

(F)    **Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

(G)    **Person.** Any person, organization, governmental authority or other party will be called "Person."

## II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY

I mortgage, irrevocably grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III.    DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described below:

(i)    The property which is located at **8828 BERKELEY COURT DR, ORLAND PARK, IL 60462-2083**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

REAL ESTATE INDEX NUMBER:               VOL:

(ii)    All buildings and other improvements that are located on the Described Property;

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

0042167965

(iii)     All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)     All rents or royalties and other income from the Described Property;

(v)     All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)     All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)     All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)     All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)     All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)     All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.     BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (i) I lawfully own the Property; (ii) I have the right to mortgage, grant and convey the Property to Lender; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows:

## 1.     BORROWER'S PROMISE TO PAY

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

## 2.     PAYMENTS FOR TAXES AND INSURANCE

### (A)     Borrower's Obligations

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

0042167965

**(B)    Escrow Accounts**

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all Sums Secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all Sums Secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 27, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the Sums Secured by this Security Instrument.

0042167965

## 3. APPLICATION OF BORROWER'S PAYMENTS

Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes;

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

## 4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien.** I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

## 5. BORROWER'S OBLIGATION TO MAINTAIN INSURANCE

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

0042167965

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 27 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.    **BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**
I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

0042167965

**7.    LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

.    If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

**8.    LENDER'S RIGHT TO INSPECT THE PROPERTY**

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**9.    AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY**

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other government taking of the property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

0042167965

**10. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

**(A) Borrower's Obligations**

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

**(B) Lender's Rights**

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 27 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

**11. OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12. MAXIMUM LOAN CHARGES**

If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**13. LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

0042167965

### 14. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **8828 BERKELEY COURT DR, ORLAND PARK, IL 60462-2083**. A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used In This Mortgage," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

### 15. GOVERNING LAW; SEVERABILITY

**This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located.** In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

### 16. BORROWER'S COPY

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

### 17. LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B), enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

0042167965

## 18. INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS

An **assignment** is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

## 19. CLERICAL ERRORS

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

## 20. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

## 21. WAIVER OF STATUTE OF LIMITATIONS

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

## 22. CAPTIONS

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

## 23. MODIFICATION

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

## 24. CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

**(A)** If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

0042167965

**(B)**     The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

**(C)**     If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master** or **blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master** or **blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master** or **blanket** policy to Lender annually.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

**(D)**     I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

## 25.    FUTURE ADVANCES

At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, loan will then be additional Sums Secured under this Security Instrument.

0042167965

**26.    AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)    the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**27.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

0042167965

If there is a Breach of Duty by me, the Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to, attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**28. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**
When Lender has been paid all of the amounts secured by this Security Instrument, Lender shall release or cancel this Security Instrument without charge to me except that I will pay any recordation costs.

**29. STATEMENT OF OBLIGATION**
To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

**30. WAIVER OF HOMESTEAD**
My right to any applicable homestead exemption in the Property is waived.

**THIS SPACE INTENTIONALLY LEFT BLANK.**

0042167965

**31.     ( X )  QUICK QUALIFYING LOAN PROGRAM**

    I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

    If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32.     ( X )  OWNER OCCUPANCY**

    Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

    If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

    **( X )  VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

0042167965

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_Martha Schilke_ _____ (Seal)

MARTHA SCHILKE

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

State of Illinois

County of Cook

I, the undersigned, a Notary Public in and for said county and state, do hereby certify that

_____Martha Schilke_____

Personally appeared before me and is (are) known or proved to me to be the person (s) who, being informed of the contents of the foregoing instrument, have executed same and acknowledged said instrument to be ___her___ free and voluntary act and deed and that ___She___ executed said instrument for the purposes and uses therein set forth.

Witness my hand and official seal this __8__ day of __March__ ,20_06_.

My commission expires:

_____
Notary Public

WORLD SAVINGS BANK, FSB

# E X H I B I T "A"
# LEGAL DESCRIPTION

LOAN NO. <u>0042167965</u>

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF **COOK** STATE OF **ILLINOIS**, DESCRIBED AS FOLLOWS:

THAT PART OF LOT 4 IN BERKLEY COURT, A SUBDIVISION OF THE EAST 690 FEET OF THE SOUTH 315.65 FEET OF THE SOUTHEAST 1/4 OF SECTION 3, TOWNSHIP 36 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, BOUNDED AND DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF SAID LOT 4; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST, ALONG THE WEST LINE OF SAID LOT 4, 67.95 FEET; THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 24.85; THENCE SOUTH 82 DEGREES 00 MINUTES 00 SECONDS EAST 72.67 FEET; THENCE SOUTH 08 DEGREES 00 MINUTES 00 SECONDS WEST 35.29 TO THE POINT OF BEGINNING: THENCE SOUTH 82 DEGREES 00 MINUTES 00 SECONDS 21.67 FEET: THENCE SOUTH 08 DEGREES 00 MINUTES 00 SECONDS WEST 30.17 FEET; THENCE NORTH 82 DEGREES 00 MINUTES 00 SECONDS WEST 86.00 FEET; THENCE NORTH 08 DEGREES 00 MINUTES 00 SECONDS EAST 30.17 FEET; THENCE SOUTH 82 DEGREES 00 MINUTES 00 SECONDS EAST 64.33 FEET TO THE POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

# ACORD™ EVIDENCE OF PROPERTY INSURANCE

DATE (MM/DD/YY) 01/18/2008

THIS IS EVIDENCE THAT INSURANCE AS IDENTIFIED BELOW HAS BEEN ISSUED, IS IN FORCE, AND CONVEYS ALL THE RIGHTS AND PRIVILEGES AFFORDED UNDER THE POLICY.

| PRODUCER | PHONE (A/C, No, Ext): (708) 532-7474 | COMPANY |
|---|---|---|
| Hicks Insurance Group 19144 S 88th Ave Mokena, IL 60448 | | Grange Mutual Casualty PO Box 740604 Cincinnati, OH 45274 |

CODE: 12-231  SUB CODE:

AGENCY CUSTOMER ID #: 00029659

| INSURED | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| Martha Schilke 8828 Berkley Ct Orland Park, IL 60462 | | PENDING |

| EFFECTIVE DATE | EXPIRATION DATE | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|
| 01/18/2008 | 01/18/2009 | |

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

LOCATION/DESCRIPTION

L    8828 BERKLEY CT DR ORLAND PARK, IL 60462

## COVERAGE INFORMATION

| COVERAGE/PERILS/FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| L    Dwelling | 200,000 | 500 |
| L    Personal Liability | 500,000 | |
|          Premium $841.00 | | |

## REMARKS (Including Special Conditions)

Downpayment Recieved MO#57824035500 $140.00

## CANCELLATION

THE POLICY IS SUBJECT TO THE PREMIUMS, FORMS, AND RULES IN EFFECT FOR EACH POLICY PERIOD. SHOULD THE POLICY BE TERMINATED, THE COMPANY WILL GIVE THE ADDITIONAL INTEREST IDENTIFIED BELOW _____30____ DAYS WRITTEN NOTICE, AND WILL SEND NOTIFICATION OF ANY CHANGES TO THE POLICY THAT WOULD AFFECT THAT INTEREST, IN ACCORDANCE WITH THE POLICY PROVISIONS OR AS REQUIRED BY LAW.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | |
|---|---|---|
| WORLD SAVINGS ISAOA PO BOX 7512 SPRINGFIELD, OH 4550 | X   MORTGAGEE     ADDITIONAL INSURED LOSS PAYEE LOAN # | |

**EXHIBIT**

tables'

2

AUTHORIZED REPRESENTATIVE

Jane Karner

ACORD 27 (3/93)                          ©ACORD CORPORATION 1993

**WACHOVIA**
P O BOX 7512
SPRINGFIELD, OH  45501-7512

07/18/2008

MARTHA SCHILKE
8828 BERKELEY COURT DR
ORLAND PARK, IL  60462-2083

RE:    Wachovia Mortgage Loan Number       0042167965
          Property Address                             8828 BERKELEY COURT
                                                                   ORLAND PARK, IL  60462

### NOTICE OF PLACEMENT OF INSURANCE

Policy Number: 12HOC42167965           Insurance Company:  American Security Insurance Company

Effective Date: 04/08/2008                    Expiration Date:     04/08/2009

Coverage Amount: $      200,000

Wachovia Mortgage values you as a customer and wants to ensure that your home is continually protected with adequate insurance.

In accordance with the terms of your loan documents, you must maintain adequate insurance coverage at all times and provide satisfactory evidence of coverage to Wachovia Mortgage.

We have sent you two previous letters, and our records indicate that we still have not received proof of current insurance coverage on your property.  Therefore, we have purchased a policy for fire insurance at your expense to protect our interest in the property.  The annual premium for this coverage is $ 2,034.00 which has been advanced on your behalf as provided by your loan documents.  Upon receipt of acceptable coverage, this policy will be canceled.  You will be charged only for the days that this policy was needed.  Any unearned premium will be refunded on a pro-rata basis.

Wachovia Mortgage has placed this insurance policy on your property because we have not received satisfactory evidence of insurance coverage as required by your loan documents.  Please consider the following facts concerning this insurance policy.

* **This policy insures your property for fire, extended coverage, and vandalism up to the stated limits contained in the policy.**

* **The coverage provided in this policy may not be as comprehensive as the previous policy secured by you, and the limit of liability may be unacceptable to you.**



**EXHIBIT**

tabbies®

3

AMSBEK01  5

| AGENCY: | | | |
|---|---|---|---|
| Major | Sub | Minor | State |
| 07791 | 112 | 110 | |

**American Security Insurance Company**
PO BOX 50355, ATLANTA, GA 30302

POLICY NUMBER:
12HOC42167965

## RESIDENTIAL PROPERTY POLICY
### DECLARATIONS

NAMED INSURED (Mortgagor) - Name and Address (Street No., City, State, Zip)

MARTHA SCHILKE
8828 BERKELEY COURT DR
ORLAND PARK, IL 60462-2083

MORTGAGEE-Name and Address
WACHOVIA MORTGAGE FSB, NO.512
ITS SUCCESSORS AND/OR ASSIGNS
P O BOX 7512
SPRINGFIELD, OH 45501-7512
1-866-246-9498
LOAN NUMBER   0042167965

Coverage is provided where a premium or limit of liability is shown for the coverage, subject to all conditions of this policy.

| POLICY PERIOD ONE YEAR | COVERAGES | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|---|
| EFFECTIVE DATE 04/08/2008   EXPIRATION DATE 04/08/2009 | DWELLING | $ 200,000 | $ 2,034.00 |
| EFFECTIVE TIME: 12:01 A.M. | | $ | $ |
| DESCRIBED LOCATION (If different from mailing address above) | | $ | $ |
| 8828 BERKELEY COURT ORLAND PARK, IL 60462 | | | |
| | | 0.00 % | $ 0.00 |
| | TAX CODE | 0.0 % | $ 0.00 |
| SECURITY INTEREST: | 999 | | |
| | | | |
| | | | |
| | | ANNUAL PREMIUM AMOUNT | 2,034.00 |
| | | ANNUAL TOTAL CHARGED | $ 2,034.00 |

Forms and endorsements which are made a part of this policy at time of issue

### SEE BACK FOR LIST OF FORMS ATTACHED

**Perils Insured Against and Coverage Provided:** Coverage applies to insured property against risk of direct physical loss in accordance with the provisions of the attached Residential Property Coverage form, and which is not excluded.

**Deductibles:**
With respect to all perils except Theft or Vandalism and Malicious Mischief, the sum of $ 250 shall be deducted from the amount which would otherwise be recoverable for each loss separately occurring. With respect to Theft or Vandalism and Malicious Mischief a $ 500 per loss deductible applies. With respect to vacant property a $ 1000 per loss deductible applies for Theft or Vandalism and Malicious Mischief.

ALL OTHER INQUIRIES
1-866-246-9498

CLAIMS INFORMATION ONLY
1-800-652-1262



EXHIBIT
4

Countersignature Date

Agency at

MSP-RES-INV-1-A (03/02)         Authorized Representative

MS1054

# American Security Insurance Company

## P.O. BOX 50355, ATLANTA, GA 30302

A STOCK INSURANCE COMPANY
HEREIN CALLED THIS COMPANY
INCORPORATED UNDER
THE LAWS OF DELAWARE

MARTHA SCHILKE
8828 BERKELEY COURT DR
ORLAND PARK, IL  60462-2083

## READ YOUR POLICY CAREFULLY

# Residential Policy

**This policy only covers buildings and structures.  It does <u>not</u> cover your personal property, <u>nor</u> does it provide you with any liability coverage.**

THIS POLICY JACKET TOGETHER WITH DWELLING FORM, DECLARATIONS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY

MSP-RES-INV-J(8/88)

## NOTICE TO POLICYHOLDERS

We are here to serve you. . . . .

As our policyholder, your satisfaction is very important to us.  Should you have a valid claim, we fully expect to provide a fair settlement in a timely fashion.

If you are not satisfied. . . . .

Should you feel you are not being treated fairly, we want you to know you may contact our office at:

American Security Insurance Company
Standard Guaranty Insurance Company
260 Interstate North Circle, SE
Atlanta, GA  30339-2210

If you are not totally satisfied, you may contact the Illinois Department of Insurance with your compliant and seek assistance from the governmental agency that regulates insurance.

To contact the Department, write or call:

Public Service Division
Illinois Department of Insurance
320 W. Washington Street
Springfield, IL  62767

MS0461

## CERTIFIED ACTS OF TERRORISM COVERAGE AND
## CAP ON CERTIFIED ACTS LOSSES

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This policy insures covered losses resulting from certified acts of terrorism.

"Certified act of terrorism" - means an act that is certified by the Secretary of the Treasury, in accordance with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act.

The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2. The act is a violent act or an act that is:
   (a) Dangerous to human life, property or infrastructure; and
   (b) Is committed by an individual or individuals as part of an effort to:
      i. Coerce the civilian population of the United States; or
      ii. To influence the policy or affect the conduct of the United States Government by coercion.

The United States Government, Department of Treasury, will pay a share of terrorism losses insured under the federal program. Under the formula the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by us. However, if aggregate insured losses attributable to certified acts of terrorism exceed $100 billion in a Program Year (January 1 through December 31), the Treasury will not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year and we have met our insurer deductible under the Terrorism Risk Insurance Act:
1. We shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion; and
2. Insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

This endorsement does not create coverage for any loss that would be otherwise excluded under the War or Nuclear exclusion in your policy.

**ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.**

MS1451



ATLANTA, GEORGIA
A STOCK INSURANCE COMPANY, HEREIN CALLED THE COMPANY

INCORPORATED UNDER
THE LAWS OF DELAWARE

ILLINOIS AMENDATORY ENDORSEMENT

The following conditions have been amended as follows:

17. CANCELLATION:  This policy may be cancelled by the company within the first 60 days of coverage has been in effect for any reason provided 30 days advance notice of such cancellation has been given to you as your last known mailing address.   Such notice shall include a reason for cancellation except for non-pay where a 10-day advance notice is required.  You may cancel this policy at any time by returning it to the Company or notifying the Company of the effective date of cancellation.  After this policy has been in effect for 61 days, the Company must give a 60 day advance notice of cancellation stating a specific explanation or reason for such cancellation.  This policy cannot be cancelled by the company after it has been in effect for 60 days except as follows:

(a) Nonpayment of premium;
(b) The policy was obtained through a material misrepresentation;
(c) Any insured who violates any of the terms and conditions of this policy;
(d) The risk originally accepted has measurably increased;
(e) Certification to the Director of the loss of reinsurance by the insurer which provided coverage to the insurer for all or a substantial part of the underlying risk insured; or
(f) A determination by the director that the continuation of this policy could place the Company in violation of the insurance laws of this State.


18. Non-Renewal. Any notice of non-renewal will be mailed to you at the last known address, and will be mailed at least 60 days in advance of the effective date. Such notice will contain the specific reason for non-renewal.

12. Loss payment  is hereby deleted and the following substituted:

Loss payment.  We will adjust all losses with you.  Payments for loss will be made within 30 days after we reach agreement with you, entry of a final court judgement, or the filing of an approved award with us.  Loss will be made payable to you and the mortgagee as their interest appear, either by single instrument so worded or by separate instruments payable respectively to you and the mortgagee, at the Company's option.  No coverage will be available to any mortgagee other than that shown on the Declarations page of this policy.

AMSAAS01

# DISCLOSURE NOTICE - APPLICANT OR POLICYHOLDER PURSUANT TO TERRORISM RISK INSURANCE ACT

Coverage for acts of terrorism is already included in your current policy or new/renewal premium quotation.

The premium that is attributable to coverage for acts of terrorism has been waived for the current policy term. Future premium charges for terrorism coverage, if any, will be made at the time of your next policy renewal.

You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2007, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under your coverage any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

If you should have any questions regarding this notice, please contact your independent insurance agent or insurance company.

**WACHOVIA MORTGAGE FSB, NO.512**

**12HOC42167965**

**A S S U R A N T**
Solutions

**A S S U R A N T**
Specialty
Property

## Privacy Policy

You are a valued customer and we strive to meet your privacy concerns. We want to make sure your personal information is protected and that you understand the policies that protect you. There are several legal terms in our privacy policy that we are required to use. We've tried to provide easy-to-understand explanations of the most frequently used legal terms. You'll find the same terms used in many companies' privacy policies.

Assurant Solutions and Assurant Specialty Property companies and other insurers that operate under this Privacy Policy ("we") provide insurance, service contracts and membership products. Our products are offered on behalf of other companies and through our agents. These other companies may be banks; finance companies; retailers; utilities; automobile dealers; manufactured housing and mortgage companies. Those companies that qualify as financial institutions must give our Privacy Policy to you each year. If you have asked not to be solicited, that request is still in effect. You do not need to contact us again. This is not a solicitation. You do not need to respond.

This Privacy Policy gives you examples of the types of data we collect, use, share or disclose; and the kinds of companies with whom we may share such data. These examples serve only as illustrations; they should not be considered all of the data we may collect, use or share. Also, we will comply with state privacy laws that may apply to data about you. Below is our privacy pledge to you:

*Our Privacy Principles:*
- We do not sell your personal information.

- We do not share customer medical information with anyone within the Assurant Solutions or Assurant Specialty Property family of companies unless you expressly authorize the sharing, or it is permitted or required by law.

- We do not allow those with whom we do business to use our customer information for their own marketing purposes.

- We contractually require any person or business providing products or services on our behalf to safeguard our customer information.

*Information We May Collect*
- Types of information we may collect and how we gather it:

- From you (or provided to us on your behalf), on applications and other forms you submit to us; for example: your name; address; telephone number; employer; and income.

- For your transactions with our companies or other nonaffiliated parties; for example: your name; address; telephone number; age; credit card use; insurance coverage; transaction history; claims history; and premiums.

- From consumer reporting agencies, public records and data collection agencies; for example: your obligations with others and your creditworthiness.

- From health care providers, such as doctors and hospitals; for example: your past or present health condition. Health data will be collected **only** if we need to find out if you are eligible for coverage, process claims, prevent fraud, as authorized by you or as the law may permit or require. NOTE: We collect health data **only** to manage a health-related product or service; for example: life or disability insurance, for which you applied.

- From you when you enroll, request a service, or file a claim on one of our websites; for example: your name, address, contract number, credit card issuer and account number, personal identification number, e-mail address, service contract and claim information.

- In some cases, from your visits to our Internet websites; for example: session number and user ID. By reviewing the legal notice, terms of use, site agreement or similar named link appearing on any of our websites that you visit you may learn of any "cookies" utilized by us and of any additional information that may be collected from you on that site.

# RESIDENTIAL PROPERTY COVERAGE

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

Throughout this policy "you" and "your" refer to the "Named Insured," shown in the Declarations. "We," "our," and "us" refer to the Company providing this insurance.

## COVERAGES

This insurance applies to the Dwelling Property described in the Declarations within the definition of property covered below, and which is not otherwise excluded.

1.  Property Covered
    We cover:

    a.  the dwelling on the Described Location, used principally for dwelling purposes not to exceed four (4) living units including, but not limited to, individually owned townhouses or permanently situated mobile homes;

    b.  structures attached to the dwelling;

    c.  materials and supplies on or adjacent to the Described location for use in the construction, alteration, or repair of the dwelling or other structures on this location; and

    d.  if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location.

2.  Property Not Covered

    a.  Personal Property of any kind.

    b.  Outdoor trees, shrubs, plants, and lawns.

    c.  Outdoor swimming pools; fences, piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls not constituting a part of buildings; walks; roadways; and other paved surfaces.

    d.  Cost of excavations, grading or filing.

    e.  Foundations of buildings, machinery, boilers or engines which foundations are below the surface of the ground.

    f.  Pilings, piers, pipes, flues, and drains which are underground.

    g.  Pilings which are below the low water mark.

    h.  Land (including land on which the property is located).

## PERILS INSURED AGAINST

We insure against risks of direct loss to covered property only if that loss is a physical loss to property. However, we do not insure losses which are excluded below:

1.  We do not insure for loss involving collapse, other than as provided in Other Coverages 5. However, any ensuing loss not excluded or excepted is covered.

2.  We do not insure for loss caused by:

    a.  freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(2) water which backs up through sewers or drains or water emanating from a sump pump, sump pump well or similar device designed to prevent overflow, seepage or leakage of subsurface water; or

(3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

d. Power Failure, meaning the failure of power or other utility service if the failure takes place off the described premises. But, if a Covered Cause of Loss ensues on the described premises, we will pay only for that ensuing loss.

e. Neglect, meaning your neglect to use all reasonable means to save and preserve property at and after the time of loss.

f. War, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

g. Nuclear Hazard, meaning any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke.

This coverage does not apply to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

h. Intentional Loss, meaning any loss arising out of any act committed:

(1) by you or at your direction; and

(2) with the intent to cause a loss.

4. We do not insure for loss caused by any of the following. However, any ensuing loss not excluded or excepted is covered.

a. Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 3. above to produce the loss;

b. Acts or decisions, including the failure to act or decide, or any person, group, organization or governmental body;

c. Faulty, inadequate or detective:

(1) planning, zoning, development, surveying, siting;

(2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) materials used in repair, construction, renovation or remodeling; or

(4) maintenance;

of part or all of any property whether on or off the described premises.

## OTHER COVERAGES

1. **Other Structures**

Subject to the provisions of this article, we cover other structures on the Described Location, separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line or similar connection are considered to be other structures.

2. Other Insurance. If there is any other valid or collectible insurance which would attach if the insurance under this policy had not been effected, this insurance shall apply only as excess and in no event as contributing insurance and then only after all other insurance has been exhausted.

3. Insurance Interest and Limit of Liability. Even if more than one person has an insurable interest in the property covered, we shall not be liable:

   a.   for an amount greater than the interest of the persons insured under this policy; or

   b.   for more than the limit of liability that applies, whichever is less.

   If the Described Property is vacant and the mortgage on the property has been declared in default by the mortgagee at the time of a loss, we shall be liable for no more than the mortgagee's interest in the property at the time of loss.

   The mortgagee's interest is represented by the mortgagor's unpaid balance, less unearned interest and finance charges, less unearned insurance premiums, less collection and foreclosure expenses, and less late charges and penalties added to the mortgagor's unpaid balance after the inception date of this policy.

4. Concealment or Fraud. We do not provide coverage if you have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance. We do not provide coverage if you have acted fraudulently or made false statements relating to this insurance whether before or after loss.

5. Your Duties After Loss. In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

   a.   give immediate notice to us or our agent;

   b.   protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of repair expenditures;

   c.   exhibit the damaged property as often as we reasonably require;

   d.   submit to signed statements and examinations under oath; and

   e.   submit to us, within 60 days after we request, your signed, sworn statement of loss which sets forth, to the best of your knowledge and belief:

       (1)  the time and cause of loss;

       (2)  the interest of you and all others in the property involved and all encumbrances on the property;

       (3)  other insurance which may cover the loss;

       (4)  changes in title or occupancy of the property during the term of the policy; and

       (5)  specifications of any damaged building and detailed estimates for repair of the damage.

6. Loss Settlement. Covered property losses are settled as follows:

   A.   Buildings at replacement cost without deduction for depreciation, subject to the following:

       (1)  We will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:

           (a)  the limit of liability under this policy applying to the building;

           (b)  the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or

           (c)  the amount actually and necessarily spent to repair or replace the damaged building.

Each party will pay the appraiser it chooses and his expenses, and equally pay expenses for the umpire and all other expenses of the appraisal.

14. Our Rights of Recovery (Subrogation). In the event of any claim under this policy, we are entitled to all your rights of recovery against another person. You must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights and do nothing after loss to prejudice our rights.

When you have made a claim under this policy and also recover from another person, the amount recovered from the other person shall be held by you in trust for us and reimbursed to us to the extent of any damages paid by us under this policy.

15. Mortgage Clause.

The word "mortgagee" includes trustee.

If a mortgagee is named in this policy, any loss payable under the policy shall be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment shall be the same as the order or precedence of the mortgages.

If we deny your claim, that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:

a. notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. pays any premium due under this policy on demand if you have neglected to pay the premium;

c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If the policy is cancelled by us, the mortgagee shall be notified at least 10 days before the date cancellation takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we shall receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

16. Suit Against Us. No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year after the loss.

17. Cancellation.

a. You may cancel this policy at any time by returning it to us or by notifying us in writing of the date cancellation is to take effect.

b. We may cancel this policy only for the reasons stated in this condition by notifying you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing shall be sufficient proof of notice.

(1) When you have not paid the premium, whether payable to us or to our agent or under any finance or credit plan, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect.

(2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by notifying you at least 10 days before the date cancellation takes effect.

**AMERICAN SECURITY INSURANCE COMPANY**
**260 Interstate North Circle SE, Atlanta, GA 30339-2210  770-763-1000**

**NOTICE**

**ILLINOIS**

Your property may be located in the New Madrid Seismic Zone as defined by the United States Geological Survey in Illinois.  Your policy does NOT provide coverage for loss caused by earthquake.

# THOMAS F. COURTNEY & ASSOCIATES
## ATTORNEYS AT LAW
7000 W. 127TH STREET
PALOS HEIGHTS, IL. 60463-1558
EMAIL: LAWYERSOFFICES@SBCGLOBAL.NET

Voice   (708)448-4400
Facsimile(708)448-9534

Facsimile 937-324-6589
Heather Price
Hazard Insurance Processing Center
Wachovia Mortgage FSB
PO Box 7512
Springfield, Ohio
45501-7512

Lender Place Policy April 8, 2008-2009
and November 6, 2007 to January 17, 2008
Re: Loan no. 0042167965
Our Client: Martha Schilke

Dear Ms. Price:

I received your fax yesterday, a copy of which is attached for your reference. The forced place policy cost or evidence of insurance was not provided. I was told the insurance cost added to my client's mortgage account was $2,000.00 for only building coverage of $200,000.00 in favor of Wachovia.

It is important that complete information be provided if Wachovia insists upon this charge for the coverage obtained. Please provide evidence of the insurance Wachovia purchased and proof of your cost. If this coverage is an addition to a master policy, I am hereby requesting a copy of the master policy, proof of the addition of the premises, and actual premium information.

Yours truly,

Thomas F. Courtney

**EXHIBIT**

5

Wachovia Mortgage FSB
PO Box 7512
Springfield, Ohio 45501-7512
1-866-246-9498

**Hazard Insurance
Processing Center**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Thomas Courtney | **From:** | Heather Prince |
| **Fax:** | 708-448-9534 | **Pages:** | 1 |
| **Phone:** | | **Date:** | 9-24-08 |
| **Re:** | Schilke | **CC:** | |
| **Policy #:** | Lender Placed Policy | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    x Please Reply    ☐ Please Recycle

● **Comments:** Thank you

**Homeowner:** Martha Schilke

**Property Address:** 8828 Berkley Ct. Orland Park IL 60462

**Loan Number:** 0042167965

The lender placed policy is effective April 8, 2008-2009. We need the policy during this time to issue a refund for the homeowner. Her previous policy cancelled April 8, 2008. there is also a charge for a lender placed policy from November 6, 2007 until January 17, 2008. My direct fax number is 937-324-6589. If you need any further assistance our customer service phone number is 866-246-9498.

This facsimile transmission is confidential. It is intended for the use of the addressee only. If you are not the addressee (or a person responsible for delivering this transmission to the addressee), do not use this transmission in any way, but promptly destroy it and contact the sender by telephone

**EXHIBIT**

tabbies

6

P.O. Box 659556
San Antonio, TX 78265 9558



September 29, 2008                                Loan Number: 0042167965

                                                            WACHOVIA

                        REINSTATEMENT QUOTE


Martha Schilke
8828 Berkley Ct
Orland Park, IL 60462 2083


Customer:  Martha Schilke
Property: 8828 Berkeley Court, Orland Park IL 60462

Dear Sir or Madam:

Please find the breakdown of the total amount due to reinstate the
above loan from foreclosure status as indicated below.  Should you
have any questions, please contact us at 800-282-3458.  A
representative is available to assist you Monday through Friday,
9:00 a.m. to 6:00 p.m., Eastern Time.

Breakdown of Total Due to Reinstate:
    15 payment(s):                                      11,007.02
    Advance(s): Escrow                                        .00
    Accrued Late Charge:                                   577.77
    Miscellaneous Fee(s):
                                                             .00
                                                             .00
             Foreclosure                                 2,537.00
    Less: Credit (Suspense)              <                   .00>
                                         ------------------------
    Total required to reinstate loan in full            14,121.79
    Property Preservation/Inspection Fees                     .00
    NSF Fees                                               225.00
TOTAL REQUIRED TO REINSTATE LOAN AND RELATED            14,346.79
WACHOVIA MORTGAGE CHARGES (Good through 10-10-08)

Only certified funds will be accepted to reinstate this loan.  All
personal and/or business checks, partial funds, and cash will be
returned.  Payments may be made at any Wachovia Financial Center or
mailed to the address on page two of this letter.

Please note that we do not recognize mailing postmark dates.
Therefore, the amount quoted above must be received in a Wachovia
Financial Center or at our San Antonio office no later than 6:00 p.m.,
Eastern Time, on 10-10-08.  After this date, additional
amounts may become due.

XF613 053 PWA

EXHIBIT

7

P.O. Box 659558
San Antonio, TX 78265 9558



Martha Schilke
0042167965
September 29, 2008                                              WACHOVIA
Page 2


To remit your balance due by mail or wire, please send to:

<u>Mail</u>                               <u>Wire</u>
Wachovia Mortgage                   Wachovia Mortgage
Attn: Cashiering Dept., TX1361      ABA/RT: 053000219
4101 Wiseman Blvd.                  Account No.: 01131510715329
San Antonio, Texas 78251           Reference Loan Number

As a reminder, you are required by your Note and Security Instrument
to continue to meet and pay other obligations including, payment and
maintenance of insurance, property taxes, HOA/PUD fees, and other
assessments. If you are unable to make future payments on the
loan, pay property taxes, provide proof of hazard insurance, maintain
the collateral, or pay other obligations as required by the Note and
Security Instrument, the beneficiary or mortgagee may insist that
you do so in order to reinstate your account in good standing.  In
addition, the beneficiary or mortgagee may require, as a condition of
reinstatement, that you provide reliable written evidence that all
senior liens, property taxes, and insurance premiums are paid current.

Payment in accordance with this reinstatement quote may not be
sufficient to cure all defaults of the Note and Security Instrument.
You should review any previously issued Notices of Intent to Foreclose
or Notices of Default to determine if any non-monetary defaults remain
outstanding.  Unless all defaults are cured, foreclosure sale
proceedings will continue.

This reinstatement quote may or may not include advances for insurance,
property taxes and other assessments.  If Wachovia Mortgage advanced
delinquent property taxes, hazard/flood insurance, or other assessments
on your behalf, you may be required to make payment into an escrow
account with Wachovia Mortgage.  You will be notified in writing upon
the reinstatement of your loan as to specific requirements, if any.

Thank you for your attention to this matter.

Foreclosure Department

XF613 053 PWA

NOTICE REQUIRED BY FEDERAL LAW:
*Please be advised that Wachovia Mortgage may be attempting to collect
a debt.  If you are currently in bankruptcy or your debt has been
discharged in bankruptcy, Wachovia Mortgage is only exercising its
rights against the property and is not attempting to hold you
personally liable on the Note.

TE OF ILLINOIS ·                                          ATTY NO. 91220

COUNTY OF COOK

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT - CHANCERY DIVISION

WACHOVIA MORTGAGE, FSB F/K/A WORLD         )
SAVINGS BANK, FSB                          )
                                           )
                         PLAINTIFF         ) NO.
                                           )              08CH35395
                    VS                     ) JUDGE
                                           )
MARTHA SCHILKE; BERKLEY COURT TOWNHOUSE    )
ASSOCIATION, INC.;  UNKNOWN HEIRS AND      )
LEGATEES OF MARTHA SCHILKE, IF ANY;        )
UNKNOWN OWNERS AND NON RECORD CLAIMANTS    )
;                                          )
                                           )
                         DEFENDANTS        )

### MORTGAGE FORECLOSURE SUMMONS

To Each Defendant:
    YOU ARE SUMMONED and required to file an answer to the complaint
in this case, a copy of which is hereto attached, or otherwise file
your appearance, and pay the $163.00 fee, in the Office of the Clerk
of this Court in Room 802 of the Richard J. Daley Center, 50 W.
Washington St., Chicago, Illinois 60602

### SEE IMPORTANT INFORMATION ATTACHED
You must file within 30 days after service of this summons, not
counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU
FOR THE RELIEF REQUESTED IN THE COMPLAINT.
To the Officer:

    This summons must be returned by the officer or other person to
whom it was given for service, with endorsement of service and fees,
if any, immediately after service.  If service cannot be made, this
summons shall be returned so endorsed.  This summons may not be served
later than 30 days after its date.
### THIS IS AN ATTEMPT TO COLLECT A DEBT
### AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

ATTORNEY NO: 91220
PIERCE & ASSOCIATES                    WITNESS, SEP 23 2008 _____, ____
Attorneys for: Plaintiff
Suite 1300
1 North Dearborn                       _____
Chicago, IL 60602                           Clerk of Court
Tel. (312) 346-9088
Fax. (312) 346-1557                    Date of Service_____,_____
PA 0823013                             (To be inserted by officer on copy
                                       left with defendant or other person)

        CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**EXHIBIT**

8

### IMPORTANT INFORMATION FOR DEFENDANTS
### IN A RESIDENTIAL FORECLOSURE

(This information does not apply to a commercial foreclosure. Consult an attorney for advice.)

---

## YOU HAVE RIGHTS DURING THE FORECLOSURE

1. POSSESSION: The lawful occupants may be able to live in the house until a judge enters an order of eviction.
2. OWNERSHIP: You may have the right to sell the house or refinance the mortgage during the redemption period.
3. REINSTATEMENT: You may have the right to bring the mortgage current within 90 days after you receive this Summons.
4. REDEMPTION: You may have the right to pay off the loan during the redemption period.
5. SURPLUS: You have the right to petition for any excess money that results from a foreclosure sale of the house.
6. WORKOUT OPTIONS: The mortgage company does not want to foreclosure the mortgage if there is any way to avoid it.  Call the mortgage company or its attorneys to find out the alternatives to foreclosure.
7. GET ADVICE: This information is not exhaustive and does not replace the advice of a professional.  You may have other options. get professional advice from a lawyer or certified housing counselor about your rights and options to avoid foreclosure.
8. A LAWYER: If you do not have a lawyer, and are able to afford one, you may call one of the following Lawyer Referral Services and ask them to recommend a lawyer for you.
- Chicago Bar Association Lawyer Referral Service: (312)554-2001
- Cook County Bar Association Lawyer Referral Service: (312)630-1157
- Other Lawyer Referral Services are listed in your telephone directory.
If you cannot afford a lawyer, you may call one of the following agencies that may be able to provide you with free legal help:
*Legal Assistance Foundation of Chicago: (312)341-1070
 Horizon Legal Center: (312)360-9455
*Chicago Legal Clinic: (312)731-1762
*Chicago Volunteer Legal Services: (312)332-1624
 (*se habla Espanol)

## PROCEED WITH CAUTION

You may be contacted by people offering to help you to avoid foreclosure.  Please follow these precautions:
1. Get legal advice before entering into any deal involving your house.
2. Get legal advice before you pay money to any person offering to help you avoid foreclosure.
3. Do not sign any papers you do not understand.

THIS IS AN ATTEMPT TO COLLECT A DEBT AND INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

---

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1   MARTHA SCHILKE; 8828 BERKELEY COURT DRIVE; ORLAND PARK, IL
    60462 - CO

2   BERKLEY COURT TOWNHOUSE ASSOCIATION, INC. C/O DEBRA E.
    SKOWRON; 8807 BERKELEY COURT; ORLAND PARK, IL 60462 - CO

3   UNKNOWN HEIRS AND LEGATEES OF MARTHA SCHILKE, IF ANY; 8828
    BERKELEY COURT DRIVE; ORLAND PARK, IL 60462 - CO


               T H A N K   Y O U

PA0823013